1

2

3

4                      **UNITED STATES DISTRICT COURT**

5                          **DISTRICT OF OREGON**

6                          **PORTLAND DIVISION**

7

8   KRISTIE GITNES and DAVID LEATHAM,        )
                                             )
9              Plaintiffs,                    )   **No. 03:10-cv-00911-HU**
                                             )
10  vs.                                       )   **FINDINGS & RECOMMENDATION**
                                             )     **ON DEFENDANTS' MOTION**
11  COUNTY OF CLACKAMAS, DEPUTY SHERIFF       )      **FOR SUMMARY JUDGMENT**
    MARK NIKOLAI, DEPUTY SHERIFF MICHAEL      )
12  ZACHER, DEPUTY SHERIFF ERIK McGLOTHIN,)
    DEPUTY SHERIFF DONALD BOONE, and          )
13  DETECTIVE JAMES STROVINK, in their        )
    individual and official capacities,      )
14                                            )
               Defendants.                    )
15             _____

16

17

18  Bear Wilner-Nugent
    Counselor & Attorney at Law LLC
19  714 S.W. 20th Place
    Portland, OR 97205
20
         Attorney for Plaintiffs
21

22

23  Stephen Lewis Madkour
    Clackamas County Counsel
24  2015 Kaen Road
    Oregon City, OR 97045-1819
25
         Attorney for Defendants
26

27

28

    1 - FINDINGS AND RECOMMENDATION

1
2
3
4
5
6
7
8
9
10    HUBEL, Magistrate Judge

11         This case is before the court on the defendants' motion for

12    summary judgment, Dkt. #31.    The motion is supported by a

13    memorandum; declarations of the defendants James Strovink, Mark

14    Nicolai, Michael Zacher, Donald Boone, and Erik McGlothin; and a

15    declaration of the defendants' attorney Stephen Madkour attaching

16    excerpts from the plaintiff David Leatham's deposition.  Dkt. ##32-

17    38.    The plaintiffs have filed an opposition to the motion for

18    summary judgment, Dkt. #40, supported by declarations of the

19    plaintiffs Kristie Gitnes and David Leatham, and the declaration of

20    the plaintiffs' attorney Bear Wilner-Nugent attaching numerous

21    exhibits.  Dkt. ##40-1 through 40-19.

22         The court heard oral arguments on the motion on August 2,

23    2011. Subsequently, the defendants filed supplemental authorities,

24    Dkt. #43, and the plaintiffs filed responsive authorities, Dkt.

25    #44.  The motion now is fully submitted, and the undersigned

26    submits the following Findings and Recommendation for disposition

27    of the motion pursuant to 28 U.S.C. § 636(b)(1)(B).

28

2 - FINDINGS AND RECOMMENDATION

### FACTUAL BACKGROUND

I first note that very few facts giving rise to this case are undisputed.[1]   The parties agree that the plaintiffs Leatham and Gitnes met and began a sexual relationship in early 2008, as a result of a posting by Leatham on Craigslist.[2]  Gitnes and Leatham engaged in a sexual relationship for about six months prior to August 2008, when the events giving rise to this action occurred. Their relationship included sexual encounters in various locations including their cars, motels, and friends' homes.[3]

On August 26, 2008, the plaintiffs talked on the phone and arranged to meet one another to share a picnic lunch.  They met in a parking lot in Happy Valley, Oregon, near the Town Center Annex Mall in Clackamas County, a location where they had met on previous occasions.[4]  According to Gitnes and Leatham, they drove away from the parking lot with the intention of having their picnic in Clackamette Park.  However, due to very heavy traffic on I-205, they decided to find an alternate location.[5]  They drove to an area that was familiar to Leatham because he used to work at McFarlane's

---

[1]I will include relevant citations to the record in footnotes to provide a smoother narrative of the facts.

[2]Dkt. #32, Defs' brief, p. 1; Dkt. #38-1, Leatham Depo., pp. 14 & 59; Dkt. #40, Pl's brief, p. 1; Dkt. #40-1, Gitnes Decl., ¶ 2; Dkt. #40-2, Leatham Decl., ¶ 2.

[3]  Dkt. #32, Defs' brief, p. 1; Dkt. #38-1, Leatham Depo., pp. 23-25; *see* Dkt. #40, Pl's brief, p. 1; Dkt. #40-1, Gitnes Decl., ¶ 2; Dkt. #40-2, Leatham Decl., ¶¶ 2 & 3.

[4]  Dkt. #32, Defs' brief, p. 2; Dkt. #38-1, Leatham Depo., p. 29; Dkt. #40-1, Gitnes Decl., ¶¶ 3 & 4; Dkt. #40-2, Leatham Decl., ¶¶ 4 & 5.

[5]Dkt. #40-1, Gitnes Decl., ¶¶ 4 & 5; Dkt. #40-2, Leatham Decl., ¶¶ 5 & 6; Dkt. #38-1, Leatham Depo., p. 32.

Bark Dust ("McFarlane's"), a nearby business.[6]  In his Declaration, Leatham describes the area as "a wooded, undeveloped location . . . that [he] believed would offer Ms. Gitnes and [him] a cool, quiet, inviting place to picnic."[7]  In his deposition, he initially described the location as being "as decrepit, as derelict as it ever was,"[8] but he clarified that by "derelict," he simply meant it was "undeveloped."[9]  He testified the area was "very nice," and "a nice little woodsey [sic] area."[10]  They parked as close as they could get and then walked down a "path"[11] or "an established trail leading into the wooded area," where they laid out their blanket and had their picnic.[12]

At some point, Leatham began looking around the picnic site at some discarded magazines and bottles.[13]  They were startled when a woman shouted at them and then ran away from the location.  They could not understand what the woman had said nor could they see the woman's face, but they felt uncomfortable and decided to leave.

_____

[6]Dkt. #38-1, Leatham Depo., p. 32; Dkt. #40-2, Leatham Decl., ¶ 7.

[7]Dkt. #40-2, Leatham Decl., ¶ 7.

[8]Dkt. #38-1, Leatham Depo., p. 32-33.

[9]*Id.*, p. 33.

[10]*Id.*

[11]*Id.*, p. 34.

[12]Dkt. #40-2, Leatham Decl., ¶ 7; Dkt. #38-1, Leatham Depo., p. 34; *see* Dkt. #40-1, Gitnes Decl., ¶ 6.

[13]Dkt. #40-2, Leatham Decl., ¶ 9; Dkt. #40-1, Gitnes Decl., ¶ 7.

4 - FINDINGS AND RECOMMENDATION

1   They picked up their things and began walking back up the path

2   toward Leatham's car.[14]

3       At about the same time, Clackamas County Sheriff's Deputy

4   Michael Zacher was on traffic enforcement duty on his motorcycle.

5   He heard a dispatch about a possible rape in progress in a wooded

6   area by McFarlane's.  The information given by the dispatcher was

7   that a woman was naked and tied to a tree being raped.[15]  Zacher

8   went to the scene, where he was approached by a woman who motioned

9   for him "to follow her as she began running down a path to the

10  railroad tracks."[16]  Zacher followed the woman to a location she

11  identified as the area where she had seen the female tied to a

12  tree.

13      Leatham and Gitnes state that as they were returning to

14  Leatham's car, they heard shouts from a woman and a man behind them

15  telling them to "come back."  Based on the tenor of the shouts,

16  they were afraid some unknown individuals meant to do them harm, so

17  they began running.  Gitnes was unable to keep up with Leatham, so

18  he pulled her into some bushes near the trail to hide.  They hid in

19  the underbrush for about half an hour, waiting "for the perceived

20  danger to pass."[17]

21      As Zacher looked around the location of the possible rape, he

22  saw a man and a woman "running together down a path towards the

23

24      [14]Dkt. #40-1, Gitnes Decl., ¶¶ 7 & 8; Dkt. #40-2, Leatham
    Decl., ¶¶ 9 & 10; Dkt. #38-1, Leatham Depo., pp. 39-40.

25
26      [15]Dkt. #35, Zacher Decl., ¶¶ 1 & 2.

27      [16]*Id.*, ¶ 2.

28      [17]Dkt. #40-1, Gitnes Decl., ¶¶ 9 & 10; Dkt. #40-2, Leatham
    Decl., ¶¶ 11 & 12; *see* Dkt. #38-1, Leatham Depo., pp. 44-47, 50-51.

5 - FINDINGS AND RECOMMENDATION

railroad tracks."[18]  Zacher pursued the individuals while he called dispatch and gave a description of them, their clothing, and their direction of travel.[19]  By this time, defendants Mark Nikolai, Erik McGlothin, and Donald Boone had responded to the dispatch of a possible rape in progress.  Other law enforcement agencies also had responded including the Milwaukie Police Department and the Portland Police Bureau.[20]   The officers established a perimeter around the area, and began a search for the man and woman.  They also notified Union Pacific Railroad and asked them to shut down rail traffic on their tracks in the area during the search.[21] Deputy Boone is a K9 handler for the Clackamas County Sheriff's Office, and he began to search the area with his dog, "Mik." Another K9 unit also was searching the area, along with 10 to 15 officers.[22]

About an hour after Zacher first arrived at the scene, and about half an hour after Mik began searching, the dog indicated on an area of thick brush.  Boone called out "typical K9 commands, such as 'Clackamas County Sheriff's Office, this is your last warning.'  'Come out now or I'll send in the dog.'  'When the dog

---

[18]*Id.*

[19]*Id.*, ¶ 3; *see* Dkt. #34, Nikolai Decl., ¶ 2

[20]Dkt. #35, Zacher Decl., ¶ 3; Dkt. #34, Nikolai Decl., ¶¶ 2 & 3; Dkt. #36, Boone Decl., ¶¶ 3 & 4; Dkt. #37, McGlothin Decl., ¶¶ 2 & 3.

[21]Dkt. #34, Nikolai Decl., ¶¶ 3 & 4; Dkt. #37, McGlothin Decl., ¶ 3.

[22]Dkt. #36, Boone Decl., ¶¶ 4 & 5; Dkt. #35, Zacher Decl., ¶ 4.

6 - FINDINGS AND RECOMMENDATION

finds you he may bite you.'"[23]  Gitnes and Leatham emerged from the bushes and complied with the officers' orders for them to lie on the ground.  Nikolai asked why they were hiding, and Leatham stated he and Gitnes had been having a picnic when a woman yelled at them and they ran away.[24]  The officers informed the plaintiffs that they were responding to a report that a woman was being raped.  Both Gitnes and Leatham denied that anyone was being raped, and stated they were together consensually.[25]

The parties' versions of the events after the plaintiffs were apprehended diverge greatly, so I will summarize them separately below.  The parties agree, however, that in connection with the incident and the plaintiffs' arrests, certain media releases were issued by Detective James Strovink, acting in his capacity as Public Information Officer for the Clackamas County Sheriff's Office.  In his Declaration, Strovink states the media releases were issued in response to requests from media outlets regarding the events, and also to inform the public and account for the "vast amount of police resources dedicated to this incident."[26]  Strovink further states, "It is customary that the name of the suspect be provided in the release, and if available the photographs as

---

[23]Dkt. #36, Boone Decl., ¶ 6; Dkt. #35, Zacher Decl., ¶ 4; Dkt. #40-1, Gitnes Decl., ¶ 10; Dkt. #40-2, Leatham Decl., ¶ 13.

[24]Dkt. #40-2, Leatham Decl., ¶¶ 14 & 15; Dkt. #40-1, Gitnes Decl., ¶ 11; Dkt. #34, Nikolai Decl., ¶¶ 5 & 6; Dkt. #37, McGlothin Decl., ¶ 4; Dkt. #36, Boone Decl., ¶ 7.

[25]Dkt. #40-1, Gitnes Decl., ¶¶ 11 & 12; Dkt. #40-2, Leatham Decl., ¶ 16; Dkt. #34, Nikolai Decl., ¶¶ 6 & 7; Dkt. #35, Zacher Decl., ¶ 5.

[26]Dkt. #33, Strovink Decl., ¶¶ 1, 2 & 4.

7 - FINDINGS AND RECOMMENDATION

well."[27]   In Strovink's deposition, he testified that he was solely
responsible for the decision to issue the media releases about the
incident, and they did not have to be approved by someone else
before they were disseminated.[28]

One of the media releases stated, "[T]he incident witnessed
and reported initially as a rape in the Clackamas area, was
actually a consensual sexual/bondage encounter; engaged between a
male and female who initially met on a Craig's list - seeking this
form of sexual encounter."[29]   At his deposition, Strovink testified
he obtained this information from one of the reporting officers at
the scene, although he could not recall which officer.[30]

### The Officers' Version of Events

When the plaintiffs had been secured, Nikolai read Leatham his
*Miranda* rights and then questioned him about his presence in the
area.  As noted above, Leatham responded that he and Gitnes had
been having a picnic, and they had decided to leave because a woman
yelled at them.  Nikolai claims Leatham admitted that he was having
sex at the site with Gitnes:

> I asked him if he heard the police sirens
> and he stated that he had and that he thought
> they were for him.   I told him that the
> officers were dispatched to a person being
> raped in the area.   To that, Mr. Leatham

---

[27]*Id.*, ¶ 5; *see* Dkt. #40-4, Strovink Dep., p. 24 (stating he includes the arrested party's name in a press release on "[e]ach and every occasion").

[28]Dkt. #40-4, Strovink Depo., pp. 9-10.

[29]Dkt. #33-1, Strovink Decl., Ex. 101.

[30]Dkt. #40-4, Strovink, Depo., p. 17.

8 - FINDINGS AND RECOMMENDATION

responded, "No, no one was getting raped I assure you." "It was totally consensual."

I asked him what he was doing with Ms. Gitnes. He responded with words to the effect, "Look, I'm married, she's married." "We have known each other for six months after we met on Craigslist." "We have been dating for about that long and we go places to have sex." "This was one of them." "We were having sex and that's all I'm going to say." "You don't need to know anything else." I asked if he had anything to add and he said, "No, if you are going to arrest me then do it." "Sex is sex. Period."

Dkt. #34, Nikolai Decl., ¶¶ 7 & 8.

Nikolai then *Mirandized* Gitnes and questioned her. He told her officers had been dispatched to the scene to investigate a possible rape. According to Nikolai, Gitnes responded, "'[T]hat's f**king bullshit.' 'There was no rape.' 'It was consensual.'"[31] She admitted that she and Leatham had met through Craigslist, and they had engaged in a sexual relationship for about six months. With regard to the events of that day, Nikolai reported the following:

Ms. Gitnes also informed me that she and Mr. Leatham had agreed to meet each other. They walked down to the railroad tracks to an old camp site and decided to have sex. Gitnes stated that Leatham wanted to play "stranger rape or something." ["]He wanted to tie me up and pretend that he was raping me so I thought it sounded like fun, so I let him." "He took off my clothes and we started having sex as I stood up and he was behind me." "I can understand to a person why that would look like rape." "But that woman was wrong." "He wasn't raping me and she should have known that." "I want her name so I can call her out." "She made a big deal over nothing."

Ms. Gitnes continued to engage me in conversation. She contended that it was not a crime to have sex in a public place. I

_____

[31]Dkt. #34, Nikolai Decl., ¶ 9.

9 - FINDINGS AND RECOMMENDATION

informed her otherwise.  She then responded by claiming that, "Well, I never told you that we were having sex."  "You made that up."  "I can't go to jail because I could lose my job over this."  "I'm an ethics professor at ITT College and they will not put up with this."  "I hope you are happy that you got someone fired."  "And I will probably lose my child and he will have to go to his alcoholic father's house now."  "I hope you don't sleep at night knowing you ruined my life."

Gitnes continued, "I am going to lie."  "I will see you in court and tell them I never said we were having sex."  "You will look like a real dummy as I purge [sic] your testimony."  "Isn't perjury a crime?"  "You will be walking the streets jobless."  "You will lose your job overt [sic] this."

I responded by telling Ms. Gitnes that unless she had something relevant to the case to discuss, I had nothing else to ask her. She responded by stating that "I don't care."  "We were having sex near some railroad tracks."  "It was not in public view until she walked up on us."  "It's your informant's fault for walking up on us."

*Id.*, ¶¶ 11-14.

Zacher overheard some of Nikolai's questioning of Gitnes, and claims he heard Gitnes tell Nikolai that there was no rape and "it was consensual."[32] He further claims he "heard Ms. Gitnes state she didn't think it was a big deal, and I told her when law enforcement gets a report of a rape in progress we take it very seriously."[33]

Leatham and Gitnes were arrested and taken to the Clackamas County Jail without further incident.[34]  Leatham "was charged with Criminal Mischief I, Criminal Trespass I, Public Indecency, and

---

[32]Dkt. #35, Zacher Decl., ¶ 5.

[33]*Id.*; Dkt. #40-7, Strovink Depo., p. 20.

[34]Dkt. #37, McGlothin Decl., ¶¶ 5-7; Dkt. #36, Boone Decl., ¶ 8; Dkt. #34, Nikolai Decl., ¶ 15; Dkt. #35, Zacher Decl., ¶ 5.

10 - FINDINGS AND RECOMMENDATION

Disorderly Conduct."[35]   McGlothin claims he "called the Union Pacific Railroad special officer and confirmed that the railroad wanted to press charges."[36]

Charges against both of the plaintiffs subsequently were dropped.[37]   Nikolai subsequently destroyed his contemporaneous handwritten notes made during his on-scene interviews of the plaintiffs.  Dkt. #40, Ex. 5, Nikolai Depo., pp. 15, 33.

### The Plaintiffs' Version of Events

In the plaintiffs' Declarations, they state that when they finished their picnic lunch, they "embraced and kissed briefly," but they never removed any clothing or engaged in any sexual activity.[38]   They claim that when they were questioned by the officers, they repeatedly denied any sexual activity had taken place, consensual or otherwise, and no rape had occurred.[39]

Gitnes was questioned by Nikolai, who "repeatedly stated that he knew [she] was having sex with Mr. Leatham that afternoon, that Mr. Leatham had already admitted to having sex with [her] that afternoon, and that [she] needed to admit [she] was having sex at

---

[35]Dkt. #37, McGlothin Decl., ¶ 8.

[36]*Id.*

[37]Dkt. #32, Def's brief, p. 8.

[38]Dkt. #40-2, Leatham Decl., ¶ 8; Dkt. #40-1, Gitnes Decl., ¶ 6; *see* Dkt. #38, Leatham Depo., p. 36 ("We made out a little bit.")

[39]Dkt. #40-1, Gitnes Decl., ¶¶ 11 & 12; Dkt. #40-2, Leatham Decl., ¶ 15.

11 - FINDINGS AND RECOMMENDATION

the site of [the] picnic."[40]  Gitnes was arrested "for the crime of indecent exposure."[41]  She claims Nikolai escorted her to his police car, and on the way to the car, the following events occurred:

> At one point, he led me up a steep brick viaduct, but I was not able to keep up with him in my flip-flop sandals and I fell down. Deputy Nikolai proceeded to drag me up the rest of the viaduct, causing me to [receive] cuts and abrasions on my legs.  When we arrived at his police car, he threw me roughly onto the backseat, causing a large bruise.

Dkt. #40-1, Gitnes Decl., ¶ 13.

Gitnes further claims that at the time she was booked into the jail, "hostile" deputies rushed her into signing a personal property inventory form before she had time to read it completely. She claims she had "approximately $160 in cash . . . placed in several locations in [her] wallet," and when she was released, the money was gone.  She later reviewed the personal property inventory form and observed that the cash was not listed on the form.[42]

Gitnes reviewed Nikolai's official report after she was released from jail.  She claims she did not make any of the admissions and statements Nikolai attributed to her, and alleges Nikolai fabricated the report "to incriminate [her] for the crimes [she] had been arrested for by Deputy Nikolai."[43]

Gitnes states she was fired from her job at ITT Technical College as a result of the publicity surrounding her arrest.  She

---

[40]Dkt. #40-1, Gitnes Decl., ¶ 12.

[41]*Id.*, ¶ 13.

[42]*Id.*, ¶ 14.

[43]*Id.*, ¶ 15.

12 - FINDINGS AND RECOMMENDATION

claims she 'also suffered ridicule, humiliation, and condemnation from family, friends, and acquaintances as a result of [her] arrest and subsequent publicity."[44]   She claims that since her arrest, she has "continued to experience anxiety about being forced to relive [the] events against her will when confronted by others who are aware of them."[45]   She also claims that subsequent romantic partners ended their relationship with her when they learned about the incident.[46]

In Leatham's Declaration, he claims that when Nikolai questioned him at the scene, Leatham "denied his repeated assertions that we were engaging in sexual contact."[47]   Leatham states Nikolai asked if he had raped Gitnes, and Leatham responded "that all of [their] activities together were always consensual."[48]   In his deposition, Leatham testified he was "confrontational" and "very uncooperative" because he did not believe Nikolai had any reason to arrest him.[49]   Leatham denies every having a "rape reenactment fantasy," and testified he never would have said something to that effect.[50]

---

[44]*Id.*, ¶ 16.

[45]*Id.*, ¶ 17; *see* Dkt. #38-1, Leatham Depo., pp. 97-98 (describing Leatham's anxiety symptoms that he's observed since the incident).

[46]*Id.*, ¶ 18.

[47]Dkt. #40-2, Leatham Decl., ¶ 15.

[48]*Id.*

[49]Dkt. #38-1, Leatham Depo., pp. 57, 60.

[50]*Id.*, p. 60.

13 - FINDINGS AND RECOMMENDATION

1    Leatham further claims that when McGlothin conducted a pat-
2 down search of his person before placing him in the police car,
3 McGlothin removed a cell phone from a holster on Leatham's belt.
4 He claims the cell phone was not listed on the property inventory
5 at the jail, and he has never been able "to retrieve it or gain any
6 additional information about its whereabouts from jail deputies."[51]

7    Like Gitnes, Leatham also claims Nikolai's official report
8 attributes statements to him that he never made, and he alleges
9 those statements were made to incriminate him for the crimes with
10 which he was charged.[52] He asserts he was fired from his job as a
11 result of publicity generated by his arrest, and he has "suffered
12 ridicule, humiliation, and condemnation from family, friends, and
13 acquaintances as a result of [his] arrest and subsequent
14 publicity."[53]

15    Prior to initiating suit in this court, the plaintiffs issued
16 a tort claim notice to Clackamas County for false arrest, malicious
17 prosecution, illegal search and seizure, excessive use of force,
18 and libel.  In the notice, the plaintiffs claimed the Clackamas
19 County District Attorney only filed charges against them after
20 Gitnes "contacted Fox News asking for a retraction of the libelous
21 news story" about the incident.[54]

22

23

24    [51]Dkt. #40-2, Leatham Decl., ¶ 16 & 17; *see* Dkt. #38-1, Leatham
25 Depo., pp. 63-64.

26    [52]*Id.*, ¶ 18.

27    [53]*Id.*, ¶ 19.

28    [54]Dkt. #20, First Amended Complaint, p. 14.

14 - FINDINGS AND RECOMMENDATION

The Clackamas County tort claims administrator investigated the plaintiffs' allegations and concluded there was no "evidence that Clackamas County was in any way negligent."[55]  The claims analyst sent a denial of claim to the plaintiffs, stating, among other things:

> The proximate cause of your situation was your choice to have a sexual tryst in public.  You both made poor choices on the day in question and as a result faced the consequences of your actions.  The Sheriff's office and other law enforcement personnel were responding to a 911 call that was a suspected rape in progress.  They responded to the report as they would with any suspected criminal activity of this nature. . . .  Simply because the District Attorney's [sic] has not prosecuted you, does not mean that there was no probable cause to detain, cite and arrest you.  We are confident that a jury would agree with our position.

Dkt. #20, First Amended Complaint, p. 18.

### SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)).

---

[55] *Id.*, p. 18.

The Ninth Circuit Court of Appeals has described "the shifting burden of proof governing motions for summary judgment" as follows:

> The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. 2548.  Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S. Ct. 2548.  This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 528 (1986).  In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S. Ct. 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

## DISCUSSION

In the plaintiffs' First Amended Complaint, they bring four claims for relief, to-wit: First Claim - Violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution; Second Claim - False Arrest; Third Claim - Intentional Infliction of Emotional Distress; and Fourth Claim -

16 - FINDINGS AND RECOMMENDATION

Negligence. Dkt. #20. The defendants seek summary judgment on all of the plaintiffs' claims. Dkt. #32.

### A. Constitutional Claim

The plaintiffs bring their First Claim for Relief under 42 U.S.C. § 1983, alleging that Nikolai, Zacher, McGlothin, and Boone arrested and jailed them without probable cause, in violation of the plaintiffs' "rights to be free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution." Dkt. #20, ¶ 30; *see id.*, ¶ 29. They further allege the defendants' actions were reckless and wanton, entitling them to punitive damages. *Id.*, ¶ 32.

The defendants assert, first, that it was only Nikolai who arrested the plaintiffs, not Zacher, McGlothin, or Boone, and therefore no Fourth Amendment claim can be maintained against Zacher, McGlothin, or Boone. Dkt. #32, p. 10. The plaintiffs argue these three defendants "participated directly and substan- tially in the process of arresting [them]," and without all of the individual defendants' participation, the plaintiffs' arrests would not have been effectuated. Dkt. #40, p. 10; *see id.*, pp. 9-10.

An arrest, or "seizure" in Fourth Amendment parlance, occurs when a person's liberty is restricted by a law enforcement officer through coercion, the use of physical force, or a show of authority. *Hopkins v. Bonvincino*, 573 F.3d 752, 773 (9th Cir. 2009) (citations omitted). "A person's liberty is restrained when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police

presence and go about his business." *Id.* (internal quotation marks, citations omitted).  Viewing the facts in the light most favorable to the plaintiffs, as the non-moving parties, Zacher and Boone both assisted in apprehending the plaintiffs, Zacher assisted in Nikolai's questioning of Gitnes, and McGlothin conducted a pat-down search of Leatham and then transported him to the jail.  On this record, a material question of fact precludes finding that Zacher, McGlothin, and Boone did not participate directly in the plaintiffs' arrests.  All of the officers exhibited a sufficient show of authority for the plaintiffs to conclude they were not at liberty to ignore any of the officers' directives and go about their business, and all of the officers were involved in some way in restricting the plaintiffs' liberty.  The more significant question is whether the officers had probable cause to arrest either or both of the plaintiffs.

"A police officer has probable cause to arrest a suspect without a warrant if the available facts suggest a 'fair probability' that the suspect has committed a crime." *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006) (citing *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002); *United States v. Fixen*, 780 F.2d 1434, 1436 (9th Cir. 1986)).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 593, 160 L. Ed. 2d 537 (2004) (citing *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 800, 157 L. Ed. 2d 769 (2003)); *see Lacey v. Maricopa County*, ___ F.3d ___, 2011 WL 2276198, at *9 (9th Cir. June 9, 2011) ("'Probable cause

18 - FINDINGS AND RECOMMENDATION

exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene) a prudent person would believe the suspect had committed a crime.'") (quoting *Dubner v. City & County of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001)). The court looks at all of the events leading up to the arrest to determine whether they amount to probable cause, "'viewed from the standpoint of an objectively reasonable police officer.'" *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 800, 157 L. Ed. 2d 769 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 1661, 134 L. Ed. 2d 911 (1996)); *see Lacey, supra*.

Notably, officers need not "believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence that a suspect has committed a crime"; they only need to believe a "fair probability" exists that the suspect committed the crime. *Garcia v. County of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011) (internal quotation marks, citation omitted).

Here, the undisputed facts known to the officers at the time of the plaintiffs' arrest included the following: (1) a "911" call had been received to report a possible rape in progress; (2) officers responded to investigate, and an officer saw two individuals apparently fleeing the scene of the alleged rape; (3) a number of officers and K-9 units searched the area and located the plaintiffs hiding in some bushes; (4) the plaintiffs matched the description of the individuals seen fleeing the scene; (5) the plaintiffs admitted they had been having a picnic in the area; and

(6) although possibly not known to the plaintiffs[56], the area where they had their picnic was a railroad right-of-way upon which they had admitted to trespassing.  Even viewing the facts in the light most favorable to the plaintiffs, the officers had probable cause to arrest them on at least a charge of criminal trespass.[57]

Moreover, under Oregon law, the eyewitness's report of a rape in progress provided probable cause to arrest the plaintiffs.  A report by "a named citizen-informant is deemed reliable if [s]he personally observed the events reported and voluntarily initiated the report." *State v. Faulkner*, 89 Or. App. 120, 747 P.2d 1011 (1987) (citing *State v. Evoniuk/Niemi*, 80 Or. App. 405, 409-10, 722 P.2d 1277, 1279 (1986)).

In *State v. Hames*, 223 Or. App. 624, 196 P.3d 88 (2008), the Oregon Court of Appeals discussed three factors important in determining the reliability of a citizen-informant's report:

> The first is whether the informant is exposed to possible criminal and civil prosecution if the report is false.  That factor is satisfied if the informant gives his or her name to law enforcement authorities or if the informant delivers the information to the officer in person.  [Citation omitted.]  The second factor is whether the report is based on the personal observations of the informant.  An officer may infer that the information is based on the informant's personal observations

---

[56]*Cf. United States v. Aguilar*, 883 F.2d 662, 673 (9th Cir. 1989) ("It is axiomatic that ignorance of the law is no defense.") (citations omitted).

[57]Under Oregon law, "[a] person commits the crime of criminal trespass in the first degree if the person . . . [e]nters or remains unlawfully upon railroad yards, tracks, bridges or rights of way[.]"  O.R.S.§ 164.255(1)(c).  "A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully . . . in or upon premises."  O.R.S. § 164.245(1).

20 - FINDINGS AND RECOMMENDATION

if the information contains sufficient detail that "[i]t is then apparent that the informant had not been fabricating [the] report out of whole cloth . . . [and] the report [is] of the sort which in common experience may be recognized as having been obtained in a reliable way. . . ." *Spinelli v. United States*, 393 U.S. 410, 417-18, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *see [State v.] Shumway*, 124 Or. App. [131], 136, 861 P.2d 384 [(1993)] (inferring personal knowledge from level of detail in an informant's account). The final factor is whether the officer's own observations corroborated the informant's information. The officer may corroborate the report either by observing the illegal activity or by finding the person, the vehicle, and the location substantially as described by the informant. [Citations omitted.]

*Hames*, 223 Or. App. at 629, 196 P.3d at 91.

All three factors were satisfied in the present case. The citizen-informant gave the officers her name. She met Zacher at the scene and led him to the place she claimed to have witnessed the rape in progress. Zacher saw two individuals, later identified as the plaintiffs, fleeing the scene. He also observed the wooded area, and the tree where the witness claimed to have seen a woman tied up and being raped. Zacher's observations corroborated, in part, the witness's report.

The plaintiffs make much of the fact that the witness who made the "911" call to police might have been known to the officers to be mentally unstable or unreliable. Even if that were the case, the officers nevertheless would have had a duty to respond to a reported rape in progress. Moreover, in the final analysis, what brought the officers to the scene initially is irrelevant to the present inquiry. The question is whether the officers had probable cause to arrest the plaintiffs *at the time of their arrest. See,*

21 - FINDINGS AND RECOMMENDATION

1  *e.g., John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008)

2  ("The determination whether there was probable cause is based upon

3  the information the officer had at the time of making the arrest.")

4  (citing *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588,

5  593, 160 L. Ed. 2d 537 (2004)).  Even if the informant's report of

6  an alleged rape-in-progress could be discredited on the basis of

7  the officers' knowledge that she was mentally unstable, they

8  nevertheless had information based on the plaintiffs' own

9  admissions that a crime likely had been committed.

10      The court finds "no reasonable jury could find that the

11  officers . . . did not have probable cause to arrest" the

12  plaintiffs. *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984)

13  (citation omitted).  As a result, the defendants' motion for

14  summary judgment should be granted on the plaintiffs claim under 42

15  U.S.C. § 1983, that the defendants violated their constitutional

16  rights by arresting them without probable cause.[58]

17

18                    ***B.   False Arrest Claim***

19      In their second claim for relief, the plaintiffs allege the

20  defendants falsely confined them without lawful authority.  The

21  parties agree that a false arrest claim has four elements, to-wit:

22  "(1) defendant must confine plaintiff; (2) defendant must intend

23  the act that causes the confinement; (3) plaintiff must be aware of

24  the confinement; and (4) the confinement must be unlawful." *Hiber*

25  *v. Creditors Collection Service of Lincoln County, Inc.*, 154 Or.

26

27      [58]Having so found, the court does not need to reach the issue
    of whether the defendants would be entitled to qualified immunity
28  on this claim.

App. 408, 413, 961 P.2d 898, 901 (1998) (citing *Lukas v. J.C. Penney Co.*, 233 Or. 345, 353, 378 P.2d 717, 720 (1963); *Walker v. City of Portland*, 71 Or. App. 693, 697, 693 P.2d 1349, 1351 (1985)).  Because the court has found the plaintiffs' arrests were lawful, their claim for false arrest fails as a matter of law. "The existence of probable cause is dispositive as to false arrest . . . claims." *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010).

### C.  Intentional Infliction of Emotional Distress Claim

The plaintiffs bring a claim against the defendants for intentional infliction of emotional distress ("IIED"), contending the defendants' actions "constituted an extraordinary transgression of the bounds of socially tolerable conduct, and [were] intended to cause severe emotional distress, or, in the alternative, [were] done with knowledge that such distress was substantially certain to result."  Dkt. #20, ¶ 43.

In *Mayorga v. Costco Wholesale Corp.*, the Ninth Circuit Court of Appeals, applying Oregon law, observed:

> To succeed on a claim for intentional inflic-
> tion of emotional distress, a plaintiff must
> prove: "(1) the defendant intended to inflict
> severe emotional distress on the plaintiff,
> (2) the defendant's acts were the cause of the
> plaintiff's severe emotional distress, and (3)
> the defendant's acts constituted an extra-
> ordinary transgression of the bounds of
> socially tolerable conduct." *McGanty v.
> Staudenraus*, 321 Or. 532, 901 P.2d 841, 849
> (1995) (internal quotation marks and citation
> omitted).

*Mayorga*, 302 F. App'x 748, 749 (9th Cir. 2008); *accord Grimmett v. Knife River Corp.-Northwest*, No. CV-10-241, slip op., 2011 WL

841149 (D. Or. Mar. 8, 2011) (Hubel, MJ); *see House v. Hicks*, 218
Or. App. 348, 357-58, 179 P.3d 730, 736 (2008) (IIED plaintiff must
prove that defendants "intended to cause plaintiff severe emotional
distress or knew with substantial certainty that their conduct
would cause such distress"; that defendants' conduct was
"outrageous . . . *i.e.*, conduct extraordinarily beyond the bounds
of socially tolerable behavior"; and that defendants' "conduct in
fact caused plaintiff severe emotional distress") (citing *McGanty
v. Staudenraus*, 321 Or. 532, 543, 550, 901 P.2d 841 (1995)).  "'A
trial court plays a gatekeeper role in evaluating the viability of
an IIED claim by assessing the allegedly tortious conduct to
determine whether it goes beyond the farthest reaches of socially
tolerable behavior and creates a jury question on liability.'"
*Ballard v. Tri-County Metro. Transp. Dist. of Oregon*, No. 09-873,
slip op., 2011 WL 1337090 (D. Or. Apr. 7, 2011) (Papak, MJ)
(quoting *House*, 218 Or. App. at 358, 179 P.3d at 736; and citing
*Pakos v. Clark*, 253 Or. 113, 453 P.2d 682, 691 (1969) "('It was for
the trial court to determine, in the first instance, whether the
defendants' conduct may reasonably be regarded as so extreme and
outrageous as to permit recovery.')").

    For conduct to be sufficiently "extreme and outrageous" to
support a claim for IIED, the conduct must be "'so outrageous in
character, and so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly
intolerable in a civilized community.'"  *House*, 218 Or. App. at
358-60, 179 P.3d at 737-39 (quoting *Restatement (Second) of Torts*,
§ 46, comment d).  The determination of whether conduct rises to
this level "is a fact-specific inquiry, to be considered on a case-
24 - FINDINGS AND RECOMMENDATION

by-case basis, based on the totality of the circumstances." *Id.*
However, although the inquiry is fact-specific, the question of
whether the defendant's conduct exceeded "the farthest reaches of
socially tolerable behavior" is, initially, "a question of law."
*Houston v. County of Wash.*, 2008 WL 474380, at *15 (D. Or. Feb. 19,
2008) (citation omitted).  On summary judgment, then, the court
must assess whether, if the defendants' conduct alleged by the
plaintiffs is proven at trial, that conduct is sufficiently beyond
the pale to state an IIED claim.

Although the court has found the defendants had probable cause
to arrest the plaintiffs, that does not mean the defendants
automatically are insulated from liability for their actions
surrounding the plaintiffs' arrests.  The plaintiffs allege Nikolai
fabricated portions of his incident report that led to the
plaintiffs being charged with Public Indecency, resulting in the
loss of their jobs, public humiliation and ridicule, and ongoing
physical and psychological problems to Gitnes.  Gitnes further
claims Nikolai injured her as he dragged her up a viaduct, and then
"threw [her] roughly onto the backseat [of his police car], causing
a large bruise."[59]  Dkt. #40-1, Gitnes Decl., ¶ 13.  The issue is
whether these actions would rise to the level required to sustain
an IIED claim.

Oregon law identifies "several contextual factors that guide
the court's classification of conduct as extreme and outrageous."

_____

[59]Although Gitnes has not brought an excessive force claim
against Nikolai, evidence that he injured her in the course of her
arrest could reflect on the officer's intent.  Whether or not this
evidence will be admissible at trial is a question for the trial
court.

25 - FINDINGS AND RECOMMENDATION

*House*, 218 Or. App. at 360, 179 P.3d at 737.  The most important of these factors is "whether a special relationship exists between a plaintiff and a defendant, such as . . . [a] government officer-citizen, that shapes the interpersonal dynamics of the parties." *Id.*  This type of special relationship "'imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers.'" *Id.* (quoting *McGanty v. Staudenraus*, 321 Or. 532, 547-48, 901 P.2d 841, 851 (1995)*)*.  Here, a special relationship existed between the officers and the plaintiffs.

Specifically in the context of a false police report, Oregon "case law suggests that the character of the false statements must defame or significantly stigmatize the IIED plaintiff, that is, they must describe that person and be injurious to his or her reputation."  *House*, 218 Or. App. at 363, 179 P.3d at 739.  The Oregon Court of Appeals has found the publication of a false or unfounded statement that defames or otherwise significantly stigmatizes a person "'is conduct that, if found to be true by a factfinder, constitutes an extraordinary transgression of what is socially tolerable."'  *Id.* (quoting *Checkley v. Boyd*, 170 Or. App. 727, 14 P.3d 81, 86 (2000)).

The court finds Nikolai's actions, if proven, would exceed "the farthest reaches of socially tolerable behavior," and would allow the plaintiffs' IIED claim to go to the jury.[60]  Therefore,

---

[60]Notably, as discussed *infra*, under the version of the Oregon Tort Claims Act in effect at the time, the plaintiffs' IIED claim could go forward only against the County, not against Nikolai personally.  Furthermore, the Oregon Tort Claims Act specifically prohibits an award of punitive damages on any claim subject to the

the defendants' motion for summary judgment should be denied as to Nikolai.  However, the court finds no such egregious conduct on the part of any of the other officers, and the defendants' motion for summary judgment should be granted as to Zacher, Mcglothin, Boone, and Strovink.

### D.   Negligence Claim

In their Fourth Claim for Relief, the plaintiffs allege that Clackamas County breached its duty "to train its sworn law enforcement personnel to uphold citizens' constitutional rights against unreasonable search and seizure and to refrain from committing intentional torts against citizens," and also "to supervise its law enforcement personnel to ensure that they were compliant with this training." Dkt. #20, ¶ 49.  The plaintiffs assert that the County's failure to train its officers properly "was so obvious and severe that it amounts to deliberate indifference towards plaintiffs' constitutional rights and rises to the level of a violation of § 1983." Dkt. #40, p. 14.

To prevail on this claim, the plaintiffs must show the County's training or supervision of its officers was "sufficiently inadequate as to constitute 'deliberate indifference' to the rights of persons with whom the [officers] come into contact." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) (citing *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

---

Act.  O.R.S.§ 30.269(1).

1   The plaintiffs have failed to offer any evidence of a pattern
2   of similar conduct by Clackamas County Sheriff's deputies to prove
3   that the County had a policy or practice of inadequately super-
4   vising its officers.   At oral argument, the plaintiffs' counsel
5   indicated he had no evidence to support this claim "at this time."
6   Discovery closed in this case on May 18, 2011, and no motion has
7   been made under Federal Rule of Civil Procedure 56(d) to allow the
8   plaintiffs to obtain further evidence.   There is nothing in the
9   record to support this claim, and the defendants' motion for
10  summary judgment should be granted on this claim.

11

12                   ***E.  Proper Party Defendant***

13      The defendants assert that under the Oregon Tort Claims Act,
14  O.R.S.§ 30.265(1), Clackamas County should be substituted as the
15  sole party defendant for the plaintiffs' tort claims.   The Oregon
16  Tort Claims Act, at the time the plaintiffs filed this action[61],
17  provided that "[t]he sole cause of action for any tort of officers,
18  employees or agents of a public body acting within the scope of
19  their employment or duties . . . shall be an action against the
20  public body only."  O.R.S. § 30.265(1).  Further, "[i]f an action
21  or suit is filed against an officer, employee or agent of a public

22

23

24       [61]The Oregon Tort Claims Act was amended by the Oregon
25  Legislature during its 2011 regular session.  As amended, the Act
    provides that under certain circumstances, based on the amount of
26  damages alleged in an action, a plaintiff may bring the action
    against an individual officer, employee, or agent, as well as the
27  public body.  The amendment was signed into law by the Governor on
    June 7, 2011, with an effective date of January 1, 2012.  *See* S.B.
28  397, 2011 Or. Legis. 270 (2011).

28 - FINDINGS AND RECOMMENDATION

body, on appropriate motion the public body shall be substituted as the only defendant." *Id.*

Accordingly, the County of Clackamas should be substituted as the only defendant for purposes of the plaintiffs' tort claims.

### *F.   Motion to Strike*

The defendants move to strike the plaintiffs' summary judgment exhibits 9 through 19 for lack of authentication and foundation. Even if those exhibits are considered, the court's findings and recommendations herein would not change. Accordingly, I deny the defendants' motion to strike as moot. Whether any of the plaintiffs' exhibits 9 through 19 will be admissible at trial is an issue for the trial court.

### *CONCLUSION*

In summary, I recommend the defendants' motion for summary judgment be denied as to the plaintiffs' IIED claim with regard to Nikolai. As to all other claims, I find no issues of material fact exist and the defendants are entitled to judgment as a matter of law.

### *SCHEDULING ORDER*

These Findings and Recommendation will be referred to a district judge. Objections, if any, are due **September 30, 2011.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due by **October 18, 2011.** When the response is

29 - FINDINGS AND RECOMMENDATION

1  due or filed, whichever date is earlier, the Findings and

2  Recommendation will go under advisement.

3      IT IS SO ORDERED.

4                          Dated this 12th day of September, 2011.

5                          /s/ Dennis J. Hubel

6      _____

7                          Dennis James Hubel
                           Unites States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30 - FINDINGS AND RECOMMENDATION